**BERNSTEIN LITOWITZ BERGER & GROSSMANN LLP**
Jonathan D. Uslaner (Bar No. 256898)
(jonathanu@blbglaw.com)
2121 Avenue of the Stars, Suite 2575
Los Angeles, CA 90067
Tel: (310) 819-3481

**DON BIVENS PLLC**
Don Bivens (*pro hac vice* forthcoming)
(don@donbivens.com)
Teresita T. Mercado (*pro hac vice* forthcoming)
(teresita@donbivens.com)
15169 N. Scottsdale Road, Suite 205
Scottsdale, AZ 85254
Tel: (602) 762-2661

*Counsel for Plaintiffs*

[Additional counsel appear on signature page.]

**UNITED STATES DISTRICT COURT**

**SOUTHERN DISTRICT OF CALIFORNIA**

JUSTIN BRADSHAW, and GUSTAVO LOPEZ, individually and on behalf of all others similarly situated,

Plaintiffs,

v.

LOWE'S COMPANIES, INC., a North Carolina corporation, and LOWES HOME CENTERS, LLC, a North Carolina limited liability company,

Defendants.

Case No. 3:25-cv-00742-DMS-MMP

**FIRST AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE CALIFORNIA INVASION OF PRIVACY ACT (CAL. PENAL CODE § 638.51)**

DEMAND FOR JURY TRIAL

Plaintiffs Justin Bradshaw and Gustavo Lopez, individually and on behalf of all others similarly situated, by and through their attorneys, make the following allegations pursuant to the investigation of their counsel and based upon information and belief, except as to allegations specifically pertaining to themselves and their counsel, which are based on personal knowledge.

## I. <u>INTRODUCTION</u>

1. Lowe's Companies, Inc. along with its subsidiary, Lowe's Home Centers, LLC (together, "Lowes" or the "Company"), is one of the largest home improvement retailers in the world, with over $86 billion dollars in annual revenue and a market capitalization of over $145 billion.

2. Among other channels, Lowes advertises and sells its products through its own website, https://www.lowes.com (the "Lowes Website"). In California alone, every year hundreds of thousands of individual users visit the Lowes Website, searching for products ranging from major appliances such as refrigerators and washing machines to outdoor accessories such as lawnmowers and weed-whackers. Many of them leave the website without making a purchase. Without the knowledge or consent of those individuals, Lowes secretly collected something of value each time they visited the Lowes Website: their personal identifying information.

3. Each time a user visited the site, Lowes secretly utilized various trackers, including the TikTok Pixel and Microsoft Bing (together, the "Trackers"), to collect their IP addresses, unique identifiers, and browsing information. Lowes then shared that personal information with TikTok and Microsoft. Lowes used this information to create targeted ads, while TikTok added the data to its database in order for the TikTok Pixel tracker itself to better identify users. Lowes never disclosed the use of the Trackers, or the transmission of the data, to its website's users.

4. Because the Trackers are "process[es] that record[] or decode[] dialing, routing, addressing, or signaling information," they were each a "pen register" under Section 638.50(b) of the California Invasion of Privacy Act ("CIPA"). Cal. Penal

Code § 638.50(b); *see also Greenley v. Kochava, Inc.*, 684 F. Supp. 3d 1024, 1050 (S.D. Cal. 2023).

5. Lowes's surreptitious capturing of the user information of Plaintiffs and the Class (as defined herein), without their knowledge or consent and without a court order, violated CIPA Section 638.51(a).

6. Plaintiffs have brought this action in order to prevent Lowes from continuing to violate CIPA, and to recover statutory damages on behalf of themselves and the Class of California residents whose data was recorded.

## II. <u>JURISDICTION AND VENUE</u>

7. This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332(d)(2)(a) because this case is a class action where the aggregate claims of all members of the proposed Class are in excess of $5,000,000.00 exclusive of interest and costs, there are over 100 members of the putative Class, and at least one Class member is a citizen of a different state than Lowes.

8. This Court has personal jurisdiction over Lowes, which carries on continuous and systematic business in California, through its own numerous retail locations, its extensive sales through retail partners, and through its website. On information and belief, Lowes has purposefully directed its activities to the Southern District of California by opening up several retail locations in this District, shipping products purchased on its website to customers in this District, and regularly tracking individuals in this District through its website. Lowes uses its website to advertise products to California residents in this District and throughout the state, either for purchase through its website, through its numerous Lowes retail locations within California, or through retail partners. Indeed, the Lowes Website identifies for shoppers the locations of the many Lowes retail stores located throughout California. Lowes's unlawful conduct is directed at and harms California residents, including Plaintiffs.

9. Venue is proper in this District pursuant to 28 U.S.C. § 1391 because Lowes: (i) is authorized to conduct business in this District and has intentionally availed itself of the laws and markets within this District; (ii) does substantial business within this District; (iii) is subject to personal jurisdiction in this District because it has availed itself of the laws and markets within this District; and (iv) caused injury to the Class to occur within this District.

## III. PARTIES

10. Plaintiff Justin Bradshaw is a resident of California, who visited the Lowes Website during the relevant period.

11. Plaintiff Gustavo Lopez is a resident of California, who visited the Lowes Website during the relevant period.

12. Defendant Lowes Companies, Inc. is a North Carolina corporation with its principal place of business in North Carolina.

13. Defendant Lowe's Home Centers, LLC is a North Carolina limited liability company whose sole member is Lowe's Companies, Inc.

14. Lowes records over $86 billion in annual revenue. Lowes operates the Lowes Website.

## IV. FACTUAL ALLEGATIONS

### A. THE CALIFORNIA INVASION OF PRIVACY ACT

15. The California Legislature enacted CIPA "to protect the right of privacy of the people of" California, recognizing that "the development of new devices and techniques for the purpose of eavesdropping upon private communications . . . has created a serious threat to the free exercise of personal liberties and cannot be tolerated in a free and civilized society." Cal. Penal Code § 630.

16. CIPA Section 638.51(a) proscribes any "person" from "install[ing] or us[ing] a pen register or a trap and trace device without first obtaining a court order." A "trap and trace device" is "a device or process that captures the incoming electronic or other impulses that identify the originating number or other dialing, routing,

addressing, or signaling information reasonably likely to identify the source of a wire or electronic communication, but not the contents of a communication." Cal. Penal Code § 638.50(c). A "pen register" is "a device or process" that records outgoing information.

17. Law enforcement has used "pen registers" to record the numbers of outgoing calls from a particular telephone line, and used "trap and trace devices" to record the numbers of incoming calls to that particular telephone line. As technology advanced, however, courts have expanded the application of these surveillance devices.

18. "[T]he California Supreme Court regularly reads statutes to apply to new technologies where such a reading would not conflict with the statutory scheme." *In re Google Inc.*, 2013 WL 5423918, at *21 (N.D. Cal. Sept. 26, 2013); *see also Javier v. Assurance IQ, LLC*, 2022 WL 1744107, at *1 (9th Cir. May 31, 2022) ("Though written in terms of wiretapping, [CIPA] Section 631(a) applies to Internet communications."). This accords with the fact that, "when faced with two possible interpretations of CIPA, the California Supreme Court has construed CIPA in accordance with the interpretation that provides the greatest privacy protection." *Matera v. Google Inc.*, 2016 WL 8200619, at *19 (N.D. Cal. Aug. 12, 2016).

19. In *Greenley*, this District explained that "[a] process can take many forms," and held that "among them is software that identifies consumers, gathers data, and correlates that data through unique 'fingerprinting.'" 684 F. Supp. 3d at 1050.

20. Software installed on a website as well as a telephone qualifies as a pen register under the statute. *See Moody v. C2 Educ. Sys. Inc.*, 742 F. Supp. 3d 1072, 1075-76 (C.D. Cal. 2024); *Zarif v. Hwareh.com, Inc.*, 2025 WL 486317, at *12 (S.D. Cal. Feb. 13, 2025). Website tracking technology is one such type of software. Indeed, courts have found the very Trackers employed by Lowes to constitute pen registers under CIPA. *See Moody*, at 1075-77.

21. In order to punish and deter privacy violations, CIPA imposes civil liability and statutory penalties of $5,000 for the installation or use of trap and trace software without a court order. Cal. Penal Code § 637.2; *see also Greenley*, 684 F. Supp. 3d at 1044-1045.

**B. LOWES'S CIPA VIOLATIONS**

22. Lowes owns and operates the Lowes Website, which users can use to browse and to purchase Lowes products.

23. When companies build their websites, they can install or integrate various third-party scripts into the code of the website in order to collect data from users or to perform other functions. "If the same third-party tracker is present on many sites, it can build a more complete user profile over time."[1]

24. One such type of tracker is known as a tracking pixel, which is a small, almost-invisible image (pixel) embedded in a website or an email to track a user's activities. That tracked data often includes the user's operating system, the type of website or email used, the time when the website was accessed, the user's IP address, and whether there are cookies that previously have been set by the server hosting the pixel image.[2]

25. Lowes has implemented the Trackers on its website in order to collect users' IP addresses,[3] unique identifiers, and browsing information, and then share the

---

[1] *See* Piwik PRO, Third-Party Tracking, https://piwik.pro/glossary/third-party-tracking/ (last visited Mar. 4, 2025) ("Third-party tracking refers to the practice in which a tracker on a website is set by a different website than the one the visitor is currently on. Third-party trackers are snippets of code that are typically installed on multiple websites. They collect and send information about a user's browsing history to other companies. . . .").

[2] *See* Patti Croft & Catherine McNally, *What Is a Web Beacon and Why Should You Care?*, All About Cookies (Feb. 19, 2025), https://allaboutcookies.org/what-is-a-web-beacon (last visited Mar. 4, 2025).

[3] Per TikTok, the TikTok Pixel gathers information about IP addresses in order to "determine the geographic location of an event" on a website that has the TikTok

information with TikTok and Microsoft without informing the website user or obtaining consent.

26. In particular, an IP address contains geographical location information from which the state, city and zip code of a specific device can be determined. Given the information that it can and does reveal, an IP address is considered personally identifiable information and, for example, is subject to HIPAA protection. 45 C.F.R. § 164.514(b)(2)(i)(O). Advertisers desire IP addresses because the geographic information allows them to target specific households, businesses, and even individuals with ads that are relevant to their interests.

27. When Plaintiffs and the other Class members visited the Lowes Website, the Lowes Website's code, at Lowes's direction, installed the Trackers onto the users' browser. It did so seamlessly, and without notice to the users.

28. By installing the Trackers, Lowes is able to track users and their interactions on its platform in order to place targeted advertisements, increasing Lowes's brand awareness and sales.

29. Both Trackers' collection of information violated CIPA, as set forth below.

**1. The TikTok Pixel**

30. Non-party TikTok is a video-hosting platform owned by Beijing-based company ByteDance Ltd. In addition to allowing users to post videos, TikTok offers several products for businesses, in particular data connections that provide companies data to support their advertising campaigns. One of those products is the TikTok Pixel.

31. The TikTok Pixel is a piece of code implemented by site owners, such as Lowes, onto their websites, which enables website owners to track users' interactions with the website. The website's owner maintains control over the data collected and

---

Pixel installed. *About TikTok Pixel*, Ads.TikTok.com (Feb. 2025), https://ads.tiktok.com/help/article/tiktok-pixel (last visited Mar. 4, 2025).

reported by the TikTok Pixel through the TikTok Events Manager, which website owners can use to specify the events they want to track and report to TikTok. The pixel also collects and reports supplementary metadata, including timestamp (when an action took place), IP address (which can be used to determine the geographic location of the user), unique identifiers (which are assigned to a user's device or browser session that distinguish one user from another), device details (make, model, operating system), and browser information. A description of the TikTok Pixel from TikTok's website appears below:

Measurement / Web measurement / TikTok Web Measurement Tools

## About TikTok Pixel

Last updated: May 2024

TikTok Pixel is a piece of code that you can place on your website that allows you to share website events with TikTok. The Pixel can be used with any TikTok for Business tools to:

- Measure traffic on your website
- Measure ad campaign performance
- Optimize your campaigns and find new customers

Once you've successfully set up and verified the pixel on your site, it will share information on when an action is taken on your website, based on the events you've set up. We recommend you set up events that reflect a full customer journey on your site, from viewing a product details page to adding an item to a cart and making a purchase. Learn more about the Events Manager.

The pixel collects information available via standard web browsers, like Chrome. This includes:

- **Ad/Event information:** Information about the ad a person on TikTok has clicked on or an event that was initiated.
- **Timestamp:** Used to determine when website actions took place, like when a page was viewed or when a product was purchased.
- **IP Address:** Used to determine the geographic location of an event.
- **User Agent:** Used to determine the device make, model, operating system, and browser information.
- **Cookies:** Used to help with the measurement, optimization, and targeting of your campaigns. First-party cookies are optional, but third-party cookies are on by default with the TikTok Pixel. Performance is boosted when first- and third-party cookies are paired with Advanced matching. Learn more about using cookies with TikTok Pixel to learn more.
- **Metadata & Button Clicks:** Includes descriptive page metadata, structured microdata, page performance data, and button clicks. In the future, this information will enable TikTok to provide recommendations on how to enhance our pixel event setup and offer automated solutions. This information can also be used to personalize ad campaigns for people on TikTok and improve TikTok's ad delivery systems. Learn more about how to enhance data postback with TikTok Pixel.

32. The TikTok Pixel also engages in a process known as "fingerprinting," through which it collects as much information as possible about the Lowes Website user and matches that information to the existing data from TikTok's database that has been gathered from other websites with the TikTok Pixel installed, which includes millions of users. *See Moody*, 742 F. Supp. 3d at 1074-75; *see also About Using Cookies with TikTok Pixel*, Ads.TikTok.com (Feb. 2025), https://ads.tiktok.com/help/article/using-cookies-with-tiktok-pixel?redirected=1 (last visited Mar. 4, 2025) (explaining that TikTok uses third-party cookies, which are "on

by default" with the TikTok Pixel, to "recognize and match events across different websites," and are a tool to "better match events with people on TikTok"). Fingerprinting allows TikTok to associate the information it obtained through use of the TikTok Pixel with personally identifying information, and thereby tracking the activity of specific devices on the Internet.

33. Once installed, the TikTok Pixel creates cookies on visitors' web browsers when they visit the website, which allows TikTok to collect data about users visiting the site. One particular cookie, the "_ttp" cookie, is a tracking cookie that identifies a visitor, regardless of whether the visitor has a TikTok account or not. If the user is logged into a TikTok account, the requests sent to TikTok include cookies that can be used to link the data to the users' TikTok profile.

34. The below image demonstrates an example of the information collected by the TikTok Pixel, including URL and clicks:




35. Lowes also uses TikTok's "AutoAdvanced Matching" technology, which allows TikTok to scan every website for information. Thus, when a website asks for information, such as name, date of birth, and address, the information is sent simultaneously to TikTok, so that TikTok can isolate with certainty the individual to be targeted. An example of the TikTok Pixel's AutoAdvanced Matching technology is reproduced below:




36. Once the users have been identified, website owners such as Lowes can use the information for analytics as well as for advertising purposes. TikTok's privacy policy (which is not cited or linked on the Lowes Website) specifically mentions several uses of the data:

- "To send promotional materials from us or on behalf of our affiliates and trusted third parties";
- "To measure and understand the effectiveness of the advertisements we serve to you and others and to deliver advertising, including targeted advertising, to you on the Platform";
- "To train and improve our technology, such as our machine learning models and algorithms"; and
- "To combine all the information we collect or receive about you for any of the foregoing purposes."[4]

[4] *Privacy Policy*, TikTok.com (Aug. 19, 2024), https://www.tiktok.com/legal/page/us/privacy-policy/en?lang%3Den= (last visited Mar. 4, 2025).

37. Moreover, TikTok shares the data it collects with third parties, explaining that "[w]e share the categories of personal information listed above with service providers and business partners to help us perform business operations and for business purposes, including . . . advertising and marketing services, analytics, measurement, data storage and hosting. . . ." *Id.*

38. The TikTok Pixel is a process to identify the source of electronic communication by capturing incoming electronic impulses and identifying dialing, routing, addressing, and signaling information generated by users. The TikTok Pixel is not only "reasonably likely" to identify the source of the incoming electronic impulses, it is expressly designed for that purpose.

39. The possession of users' private data by TikTok poses particular privacy concerns given TikTok's China-based ownership. As members of Congress from both parties and independent tech watchdogs and human rights groups have acknowledged, the Chinese government exercises tight controls over Chinese companies.

40. China's national security law requires companies to turn over customer data if requested by the government. Even wealthy tech executives who have defied the government mandate have been arrested, jailed, and even "disappeared."

41. "Our intelligence community has been very clear about China's efforts and intention to mold the use of this technology using data in a worldview that is completely inconsistent with our own," the U.S. Deputy Attorney General Lisa Monaco explained.[5]

42. Moreover, TikTok and its parent company have already abused the data TikTok collected. In 2022, *Forbes* reported that ByteDance's Internal Audit and Risk

[5] Billy Perrigo, "What to Know About the TikTok Security Concerns," *Time* (Mar. 23, 2023), https://time.com/6265651/tiktok-security-us/ (last visited Mar. 27, 2025)

Control department planned to use location data gathered by TikTok in order to surveil the devices of at least two American citizens.[6]

43. Also in 2022, ByteDance confirmed that several of its employees used TikTok data in an effort to reveal journalist sources. As ByteDance confirmed to CNN, the employees tracked the journalists' IP addresses to determine if they were at the same location as employees suspected of leaking data.[7]

**2. Microsoft Bat Bing Tracker**

44. In addition to capturing information using the TikTok Pixel, Lowes also collects the personal information of Lowes Website users through the Microsoft Bat Bing Tracker. The Bat Bing tracker is a tracker offered by Microsoft, which is also known as "Microsoft Advertising." The Microsoft Bat Bing Tracker places the bat.bing cookie on a user's browser, which collects information about the user. That information is gathered by Lowes and later disclosed by Lowes to Microsoft.

45. One such piece of personal information is an individual's Microsoft ID ("MUID"). An MUID is a unique identifier that Microsoft generates and assigns to a specific browser to track users' activity across the internet. An MUID constitutes personally identifiable information because it is unique to each user and can be used to identify individuals. In fact, Microsoft touts to its business partners (like Lowes) that its ad platform "collect[s] the [users'] IP address and Microsoft cookie," and that the data does not expire for 13 months.

---

[6] Emily Baker-White, "TikTok Parent ByteDance Planned To Use TikTok To Monitor The Physical Location Of Specific American Citizens," *Forbes* (Oct. 20, 2022), https://www.forbes.com/sites/emilybaker-white/2022/10/20/tiktok-bytedance-surveillance-american-user-data/ (last visited Mar. 4, 2025).

[7] Clare Duffy, "TikTok Confirms that Journalists' Data was Accessed by Employees of its Parent Company," *CNN* (Dec. 22, 2022), https://www.cnn.com/2022/12/22/tech/tiktok-bytedance-journalist-data/index.html (last visited Mar. 4, 2025).

46. Website owners can add the Bat Bing Tracker to the source code of their websites. Doing so allows them to track visitor actions on their websites and measure the effectiveness of advertising. Once Microsoft's trackers are embedded into a website's source code, they send data regarding specific user actions and their unique identifiers to Microsoft.

47. Microsoft utilizes that data collected in several ways, according to its privacy policy, including to: "[a]dvertise and market to [users], which includes sending promotional communications, targeting advertising, and presenting [users] with relevant offers."[8]

48. A screenshot showing the Microsoft Tracker's operation is reproduced below:




49. Microsoft's Tracker is a tool used to identify the source of electronic communication by capturing incoming electronic impulses and identifying dialing, routing, addressing, and signaling information generated by users. One of the purposes of this tracker is to identify the source of the incoming electronic impulses.

---

[8] *Microsoft Privacy Statement*, Microsoft.com (Mar. 2025), https://www.microsoft.com/en-us/privacy/privacystatement (last visited Mar. 4, 2025).

### 3. Lowes Did Not Obtain User Consent To Install A Pen Register

50. Visitors to the Lowes Website do not receive notice of the Trackers' existence and do not consent to the installation of a pen register on their devices. When a website user accessed and entered the Lowes Website during the applicable limitations period, there was no pop-up window or other notification to inform users that Lowes was using website tracking technology or installing third-party tracker cookies.

51. While Lowes's Terms of Use describe that cookies and other tracking technologies are implemented on the browser in order to collect and store data, including the ability to recognize the users' devices to deliver relevant advertisements, the Terms of Use are not readily visible or highlighted.

52. For visitors to the Lowes Website, the Terms of Use can be accessed only by clicking a hyperlink, which appears in very small font at the bottom of the Lowes Website alongside various other links. A user that does not scroll to the very bottom of the website will not see that link and, even for users that scroll that far, the link is very discrete. A screenshot of the portion of the page containing the link is reproduced below.



53. Given that users do not need to view the Terms of Use to visit the Lowes Website, and that they are not highlighted for visitors to the website, the Terms of Use are not enforceable against website visitors.

54. In addition, minor users of the website are not legally capable of entering into a contract and cannot therefore be bound by the Terms of Use.

**4. Plaintiffs' Use of the Lowes Website**

55. The Lowes Website did not ask visitors, including Plaintiffs, whether they consented to having their personally identifying and addressing information collected, stored, or disseminated.

56. Additionally, the third-party trackers were incorporated seamlessly—and, to users, invisibly—in the background on the Lowes Website. That seamless and invisible incorporation gave Plaintiffs and the Class no way of knowing that Lowes was collecting their personally identifying and addressing information, including their IP addresses, and secretly sharing that information with undisclosed third parties, including parties subject to the control of the Chinese government.

57. Plaintiffs' injuries are "fairly traceable" to Lowes's challenged conduct, *Spokeo, Inc. v. Robins*, 578 U.S. 330, 338 (2016), because Plaintiffs' private information was acquired by Lowes through the use of third-party trackers embedded into Lowes's website. Thus, Plaintiffs' injuries occurred at the moment their information was improperly acquired by Lowes. Plaintiffs meet the redressability element because courts have consistently recognized that violation of privacy rights can be redressed by an award of damages or injunctive relief. *See In re Facebook, Inc., Consumer Priv. User Profile Litig.*, 402 F. Supp. 3d 767, 784 (N.D. Cal. 2019) ("[T]he Ninth Circuit has repeatedly explained that intangible privacy injuries can be redressed in the federal courts."); *Jewel v. Nat'l Sec. Agency*, 673 F.3d 902, 912 (9th Cir. 2011) (similar). Additionally, the injunctive relief Plaintiffs seek includes terminating all downstream distributions of such personal data illegally collected, which would redress future harms suffered by Plaintiffs and the Class.

58. Plaintiffs adequately allege statutory standing to bring CIPA claims against Lowes arising from the Lowes Website's downloading of software "trackers" onto Plaintiffs' web browsers, constituting unauthorized "pen registers" under CIPA, where Plaintiffs allege that collection of IP addresses through the Trackers allowed third parties to obtain personally identifying, non-anonymized information, that IP addresses revealed geographical location and other personal information sufficient for third parties to conduct targeted advertising, that Plaintiffs were unaware of the tracking, and that Plaintiffs did not consent to it. *Shah v. Fandom, Inc.*, 2024 WL 4539577, at *5 (N.D. Cal. Oct. 21, 2024).

## V. <u>CLASS ACTION ALLEGATIONS</u>

59. Plaintiffs bring this action individually and on behalf of all others similarly situated in a Class (the "Class") defined as follows:

a. All persons within California who, during the applicable limitations period, visited the Lowes Website, leading to the Trackers being installed on their devices.

60. The following are excluded from the Class: (i) Lowes, Lowes's subsidiaries, parents, successors, predecessors, and any entity in which Lowes or its parents have a controlling interest (including current and former employees, officers, or directors); (ii) persons who properly execute and file a timely request for exclusion from the Class; (iii) the judicial officer(s) and judicial staff overseeing this litigation, as well as any of their spouses or immediate family members; (iv) Plaintiffs' counsel and Lowes's counsel, including attorneys and staff at each of the respective firms; and (v) the legal representatives, successors, and assigns of any such excluded persons or entities.

61. <u>NUMEROSITY</u>: Plaintiffs do not know the exact number of Class members but believe the number to be well into the hundreds of thousands. Preliminary estimates by Plaintiffs utilizing traffic on the Lowes Website (gathered from third-party marketing tool Semrush), indicate that over one million unique users

from California visited the Lowes Website in the past year alone. It is, therefore, impractical to join each member of the Class as a named plaintiff. Further, the size and relatively modest value of the claims of the individual members of the Class renders joinder impractical. Accordingly, utilization of the class action mechanism is the most economically feasible means of determining and adjudicating the merits of this litigation. Moreover, the Class is ascertainable and identifiable from Lowes's records.

62. COMMONALITY AND PREDOMINANCE: Common questions of fact and law exist as to all Class members, and predominate over any questions affecting only individual members of the Class. Such common legal and factual questions, which do not vary between Class members, and which may be determined without reference to the individual circumstances of any Class member, include but are not limited to the following:

a. Whether Lowes caused electronic communications from Class members with the Lowes Website to be recorded, intercepted, and/or monitored;

b. Whether Lowes aided and abetted a third-party in eavesdropping on such communications;

c. Whether Lowes installed the Trackers on the Lowes Website;

d. Whether the Trackers are trap and trace processes and/or pen registers as defined by law;

e. Whether Plaintiffs and Class members are entitled to statutory damages;

f. Whether Class members are entitled to injunctive relief; and

g. Whether Class members are entitled to disgorgement of data obtained unlawfully.

63. TYPICALITY: The claims of the named Plaintiffs are typical of the claims of the other members of the Class because the named Plaintiffs, like all other

Class members, visited the Lowes Website and had their IP address and other information collected by the Trackers, which were installed and used by Lowes.

64. ADEQUATE REPRESENTATION: Plaintiffs are adequate representatives of the Class because their interests do not conflict with the interests of the Class members they seek to represent, they have retained competent counsel experienced in prosecuting class actions, and they intend to prosecute this action vigorously. The interests of members of the Class will be fairly and adequately protected by Plaintiffs and their counsel.

65. SUPERIORITY: The class action mechanism is superior to other available means for the fair and efficient adjudication of the claims of the Class. Each individual member of the Class may lack the resources to undergo the burden and expense of individual prosecution of the complex and extensive litigation necessary to establish Lowes's liability. Individualized litigation increases the delay and expense to all parties and multiplies the burden on the judicial system presented by the complex legal and factual issues of this case. Individualized litigation also presents a potential for inconsistent or contradictory judgments. In contrast, the class action mechanism presents far fewer case management difficulties and provides the benefits of single adjudication, economy of scale, and comprehensive supervision by a single court on the issue of Lowes's liability. Class treatment of the liability issues will ensure that all claims and claimants are before this Court for consistent adjudication of the liability issues.

## VI. CAUSES OF ACTION

### COUNT I

### Violations of the California Invasion of Privacy Act

### Cal. Penal Code § 638.51

66. Plaintiffs repeat the allegations contained in the foregoing paragraphs as if fully set forth herein.

67. Plaintiffs bring this claim individually and on behalf of the members of the proposed Class against Lowes.

68. CIPA Section 638.51(a) proscribes any "person" from "install[ing] or us[ing] a pen register or a trap and trace device without first obtaining a court order."

69. A "pen register" is "a device or process that records or decodes dialing, routing, addressing, or signaling information transmitted by an instrument or facility from which a wire or electronic communication is transmitted, but not the contents of a communication." Cal. Penal Code § 638.50(b).

70. The Trackers are "pen registers" because they are "device[s] or process[es]" that "capture[d]" the "routing, addressing, or signaling information"—the IP address—from the electronic communications transmitted by Plaintiffs' and Class members' computers or smartphones. Cal. Penal Code § 638.50(b).

71. At all relevant times, Lowes installed the Trackers—which are pen registers—on Plaintiffs' and Class members' browsers, and used the Trackers to collect Plaintiffs' and Class members' IP addresses.

72. Plaintiffs and Class members did not provide their prior consent to Lowes's installation or use of the Trackers.

73. Lowes did not obtain a court order to install or use the Trackers.

74. Pursuant to Cal. Penal Code Section 637.2, Plaintiffs and Class members have been injured by Lowes's violations of CIPA Section 638.51(a), and each seeks statutory damages of $5,000 for each of Lowes's violations of CIPA Section 638.51(a).

## VII. PRAYER FOR RELIEF

WHEREFORE, Plaintiffs, individually and on behalf of all others similarly situated, seek judgment against Lowes, as follows:

a. For an order certifying the Class, naming Plaintiffs as the representatives of the Class, and naming Plaintiffs' attorneys as Class Counsel to represent the Class;

b. For an order declaring that Lowes's conduct violates the statutes referenced herein;

c. For an order finding in favor of Plaintiffs and the Class on all counts asserted herein;

d. For statutory damages of $5,000 for each violation of CIPA Section 638.51(a);

e. For pre- and post-judgment interest on all amounts awarded;

f. For an order of restitution and all other forms of equitable monetary relief; and

g. For an order awarding Plaintiffs and the Class their reasonable attorneys' fees and expenses and costs of suit.

## VIII. JURY DEMAND

Plaintiffs hereby demand a trial by jury of any and all issues in this action so triable of right.

DATED: June 10, 2025

**BERNSTEIN LITOWITZ BERGER & GROSSMANN LLP**

*/s/ Jonathan D. Uslaner*
Jonathan D. Uslaner (Bar No. 256898)
(jonathanu@blbglaw.com)
2121 Avenue of the Stars, Suite 2575
Los Angeles, CA 90067
Tel: (310) 819-3481

-and-

Avi Josefson (admitted *pro hac vice*)
(avi@blbglaw.com)
Michael Blatchley (admitted *pro hac vice*)
(michaelb@blbglaw.com)
Timothy Fleming (admitted *pro hac vice*)
(timothy.fleming@blbglaw.com)
1251 Avenue of the Americas
New York, NY 10020
Tel: (212) 554-1400

**DON BIVENS PLLC**
Don Bivens (*pro hac vice* forthcoming)
(don@donbivens.com)
Teresita T. Mercado (*pro hac vice* forthcoming)
(teresita@donbivens.com)
15169 N. Scottsdale Road. Suite 205

Scottsdale, AZ 85254
Tel: (602) 762-2661

*Counsel for Plaintiffs*