**BERNSTEIN LITOWITZ BERGER & GROSSMANN LLP**
Avi Josefson (admitted *pro hac vice*)
NYS Bar No. 4149407
(avi@blbglaw.com)
1251 Avenue of the Americas
New York, NY 10020
Tel: (212) 554-1400

**DON BIVENS PLLC**
Don Bivens (*pro hac vice* forthcoming)
(don@donbivens.com)
Teresita T. Mercado (*pro hac vice* forthcoming)
(teresita@donbivens.com)
15169 N. Scottsdale Road, Suite 205
Scottsdale, AZ 85254
Tel: (602) 762-2661

*Counsel for Plaintiffs*

[Additional counsel appear on signature page.]

**UNITED STATES DISTRICT COURT**

**SOUTHERN DISTRICT OF CALIFORNIA**

JUSTIN BRADSHAW, and GUSTAVO LOPEZ, individually and on behalf of all others similarly situated,

Plaintiffs,

v.

LOWE'S HOME CENTERS, LLC, a North Carolina limited liability company,

Defendant.

Case No. 3:25-cv-00742-DMS-MMP

**SECOND AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE CALIFORNIA INVASION OF PRIVACY ACT (CAL. PENAL CODE § 638.51)**

DEMAND FOR JURY TRIAL

Plaintiffs Justin Bradshaw and Gustavo Lopez, individually and on behalf of all others similarly situated, by and through their attorneys, make the following allegations pursuant to the investigation of their counsel and based upon information and belief, except as to allegations specifically pertaining to themselves and their counsel, which are based on personal knowledge.

## I. INTRODUCTION

1. Lowe's Home Centers, LLC ("Lowes" or the "Company") operates the website of one of the world's largest home improvement retailers, with over $86 billion dollars in annual revenue and a market capitalization of over $145 billion.

2. Lowes advertises and sells its products through, among other channels, its own website, https://www.lowes.com (the "Lowes Website" or "the Website"). In California alone, hundreds of thousands of individual users visit the Lowes Website every year, searching for products ranging from major appliances such as refrigerators and washing machines to outdoor accessories such as lawnmowers and weed whackers. The Lowes Website also sells a variety of medical devices, including wheelchairs, canes, crutches, scooters, bedside commodes, and blood pressure and glucose monitors. Many users leave the website without making a purchase. Without the knowledge or consent of those individuals, Lowes secretly collected something of value each time they visited the Website: their personal identifying information.

3. When a user visited the site, Lowes secretly installed various trackers, including the TikTok Pixel and Microsoft Bing (together, the "Trackers"), on visitors' internet browsers that gave Lowes a comprehensive picture of everything the visitors were doing on the Lowes Website—**who** they were, **what** they were doing, **when** they visited, **where** they were when they visited, **why** they were visiting, and **how** they got there.

4. To figure out **who** visitors were, the Trackers collected visitors' IP addresses and placed unique identifiers on each visitor's browser or device, such as TikTok's _ttp identifier and Microsoft's MUID, _uetsid, and _uetvid cookies (Unique

IDs), that enabled Lowes to recognize visitors when they made return visits to the Lowes Website.

5. To figure out **what** visitors were doing and **why**, the Trackers collected information about webpages that the users visited—in particular, the full destination URL of the page requested on the Lowes Website, including the path and query string. That URL data showed Lowes the kinds of products the user was looking at and what they might be interested in.

6. As for **where** a user was when they visited, the collected IP addresses contained geographic information that allowed TikTok and Microsoft to identify a visitor's location.

7. And to determine **how** a user made its way to the Lowes Website, the Trackers collected information about the websites that led visitors to Lowes (called referring URLs) along with data detailing the browser, operating system, and device a visitor used to make his way to the Website.

8. But that's only the beginning of the story. Through the Trackers, Lowes enabled TikTok and Microsoft to match Website visitors to existing profiles in their extensive user databases and track these visitors after they left the Lowes Website. Lowes then leveraged this data for targeted advertising.

9. Step one: Lowes installed Trackers that enabled TikTok and Microsoft to match Lowes Website visitors to existing consumer profiles.

10. When visitors accessed the Lowes Website, the embedded Trackers transmitted data directly to TikTok and Microsoft's servers. Both TikTok and Microsoft maintain extensive, pre-existing consumer profiles that the companies created using data they collected themselves and obtained from their vast networks of publishers and partners. Those profiles are populated with Internet-wide browsing activity, app usage, Unique IDs, location data, search history, purchase history, and inferred interests. They also contain sensitive demographic data TikTok and Microsoft either purchase from third-party data brokers or receive from their

advertisers' data partners—including, on information and belief, information from social media sites like Facebook. In other words: TikTok and Microsoft have cradle-to-grave profiles of Lowes Website visitors, containing all available information the companies could get their hands on.

11. The user data transmitted from the Lowes Website to TikTok and Microsoft served as the key that enabled these platforms to match Website visitors to their existing consumer profiles. When TikTok and Microsoft received this data, they ran it through their databases to identify matching profiles, a process that allowed them to connect Lowes Website visitors with the extensive information in their systems. Through this matching process, Lowes gained the ability to leverage TikTok and Microsoft's data for targeted advertising, including retargeting Website visitors across the internet, creating lookalike audiences, and measuring advertising campaign effectiveness, all without Website visitors' knowledge or consent.

12. Step two: collect all available forward-looking web activity of Lowes Website visitors.

13. TikTok and Microsoft used the Unique IDs the Trackers embedded on users' browsers to stalk the same users as they moved across the Internet—both on **and off** the Lowes Website. That means TikTok and Microsoft could monitor each user's web activity on a forward-looking basis, collecting data every time a user visited one of the hundreds of thousands of other, non-Lowes websites on which the Trackers were installed and adding that data to their already-massive historical datasets.

14. TikTok and Microsoft leveraged this historical and forward-looking data to provide Lowes with sophisticated advertising capabilities, including the ability to retarget Website visitors, build lookalike audiences, and track advertising conversions across their platforms. These advertising services were only possible because the Trackers on the Lowes Website transmitted visitor data that enabled TikTok and Microsoft to match visitors to profiles in their vast data repositories. For its part,

Lowes used these advertising capabilities to improve its understanding of market trends and to serve targeted ads to Lowes Website visitors as they traveled across the Internet. TikTok and Microsoft, meanwhile, added the Lowes Website visitor data to their databases to further refine their ability to identify, match, and target users across their advertising networks.

15. The process enriched Lowes because it allowed the company to sell hyper-targeted advertisements and increase its advertising revenue, made TikTok and Microsoft's services more valuable to Lowes and other customers, and invaded Plaintiffs' and the Class Members' privacy to do so.

16. Lowes never disclosed the use of the Trackers, or the transmission of the data, to its Website's users. The implementation of the Trackers on Plaintiffs' web browsers defied their reasonable expectations of privacy and was highly offensive. Lowes's own Privacy Statement, buried in a hyperlink at the bottom of its Website, promised at the time of Plaintiffs' visit that their personal data would not be shared with third parties unless Plaintiffs explicitly consented to such sharing. But Plaintiffs in no way consented to the data collection, sharing, and tracking that occurred. What's more, after Plaintiffs filed their lawsuit, Lowes deleted the language from their Privacy Statement promising that Lowes would only share visitor data with consent—in apparent recognition of the fact that they had previously been violating their own commitments.

17. Because the Trackers are "process[es] that record[] or decode[] dialing, routing, addressing, or signaling information," they were each a "pen register" under Section 638.50(b) of the California Invasion of Privacy Act ("CIPA"). Cal. Penal Code § 638.50(b); *see also Greenley v. Kochava, Inc.*, 684 F. Supp. 3d 1024, 1050 (S.D. Cal. 2023).

18. Lowes's surreptitious capturing of the user information of Plaintiffs and the Class (as defined herein), without their knowledge or consent and without a court order, violated CIPA Section 638.51(a).

19. Plaintiffs have brought this action in order to prevent Lowes from continuing to violate CIPA, and to recover statutory damages on behalf of themselves and the Class of California residents whose data was recorded.

## II. JURISDICTION AND VENUE

20. This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332(d)(2)(a) because this case is a class action where the aggregate claims of all members of the proposed Class are in excess of $5,000,000.00 exclusive of interest and costs, there are over 100 members of the putative Class, and at least one Class member is a citizen of a different state than Lowes.

21. This Court has personal jurisdiction over Lowes, which carries on continuous and systematic business in California, through its own numerous retail locations, its extensive sales through retail partners, and through its website. On information and belief, Lowes has purposefully directed its activities to the Southern District of California by opening up several retail locations in this District, shipping products purchased on its website to customers in this District, and regularly tracking individuals in this District through its website. Lowes uses its website to advertise products to California residents in this District and throughout the state, either for purchase through its website, through its numerous Lowes retail locations within California, or through retail partners. Indeed, the Lowes Website identifies for shoppers the locations of the many Lowes retail stores located throughout California. Lowes's unlawful conduct is directed at and harms California residents, including Plaintiffs.

22. Venue is proper in this District pursuant to 28 U.S.C. § 1391 because Lowes: (i) is authorized to conduct business in this District and has intentionally availed itself of the laws and markets within this District; (ii) does substantial business within this District; (iii) is subject to personal jurisdiction in this District because it has availed itself of the laws and markets within this District; and (iv) caused injury to the Class to occur within this District.

## III. PARTIES

23. Plaintiff Justin Bradshaw is a resident of California, who visited the Lowes Website during the relevant period, including in March 2025.

24. Plaintiff Gustavo Lopez is a resident of California, who visited the Lowes Website during the relevant period, including in January 2025.

25. Defendant Lowe's Home Centers, LLC is a North Carolina limited liability company whose sole member is Lowe's Companies, Inc, a North Carolina corporation with a principal place of business in North Carolina.

26. Lowes's parent company records over $86 billion in annual revenue. Lowes operates the Lowes Website.

## IV. FACTUAL ALLEGATIONS

### A. THE CALIFORNIA INVASION OF PRIVACY ACT

27. The California Legislature enacted CIPA "to protect the right of privacy of the people of" California, recognizing that "the development of new devices and techniques for the purpose of eavesdropping upon private communications . . . has created a serious threat to the free exercise of personal liberties and cannot be tolerated in a free and civilized society." Cal. Penal Code § 630.

28. CIPA Section 638.51(a) proscribes any "person" from "install[ing] or us[ing] a pen register or a trap and trace device without first obtaining a court order." A "trap and trace device" is "a device or process that captures the incoming electronic or other impulses that identify the originating number or other dialing, routing, addressing, or signaling information reasonably likely to identify the source of a wire or electronic communication, but not the contents of a communication." Cal. Penal Code § 638.50(c). A "pen register" is "a device or process" that records outgoing information. *Id.* § 638.50(b).

29. Law enforcement has used "pen registers" to record the numbers of outgoing calls from a particular telephone line, and used "trap and trace devices" to record the numbers of incoming calls to that particular telephone line. As technology

advanced, however, courts have expanded the application of these surveillance devices.

30. "[T]he California Supreme Court regularly reads statutes to apply to new technologies where such a reading would not conflict with the statutory scheme." *In re Google Inc.*, 2013 WL 5423918, at *21 (N.D. Cal. Sept. 26, 2013); *see also Javier v. Assurance IQ, LLC*, 2022 WL 1744107, at *1 (9th Cir. May 31, 2022) ("Though written in terms of wiretapping, [CIPA] Section 631(a) applies to Internet communications."). This accords with the fact that, "when faced with two possible interpretations of CIPA, the California Supreme Court has construed CIPA in accordance with the interpretation that provides the greatest privacy protection." *Matera v. Google Inc.*, 2016 WL 8200619, at *19 (N.D. Cal. Aug. 12, 2016).

31. In *Greenley*, this District explained that "[a] process can take many forms," and held that "among them is software that identifies consumers, gathers data, and correlates that data through unique 'fingerprinting.'" 684 F. Supp. 3d at 1050.

32. Software installed on a website as well as a telephone qualifies as a pen register under the statute. *See Moody v. C2 Educ. Sys. Inc.*, 742 F. Supp. 3d 1072, 1075-76 (C.D. Cal. 2024); *Zarif v. Hwareh.com, Inc.*, 789 F. Supp. 3d 880, 898-99 (S.D. Cal. 2025). Website tracking technology is one such type of software. Indeed, courts have found the very Trackers employed by Lowes to constitute pen registers under CIPA. *See Moody*, 742 F. Supp. 3d at 1075-77; *see also Bradshaw v. Lowe's Companies, Inc.*, 2025 WL 3171740, at *7 (S.D. Cal. Nov. 12, 2025) (Sabraw, J.).

33. In order to punish and deter privacy violations, CIPA imposes civil liability and statutory penalties of $5,000 for the installation or use of trap and trace software without a court order. Cal. Penal Code § 637.2; *see also Greenley*, 684 F. Supp. 3d at 1044-45.

**B. LOWES'S CIPA VIOLATIONS**

34. Lowes owns and operates the Lowes Website, which visitors can use to browse and to purchase Lowes products.

35. When companies build their websites, they can install or integrate various third-party scripts into the code of the website to collect data from users or to perform other functions. "If the same third-party tracker is present on many sites, it can build a more complete user profile over time."[1]

36. One such type of tracker is known as a tracking pixel, which is a small, almost-invisible image (pixel) embedded in a website or an email to track a user's activities. That tracked data often includes the user's operating system, the type of website or email used, the time when the website was accessed, the user's IP address, and whether there are cookies that previously have been set by the server hosting the pixel image.[2]

37. Lowes has implemented the Trackers on its website to collect, among other things, users' IP addresses (which can be used to identify a visitor's location).[3] An IP address contains geographical location information from which the state, city and zip code of a specific device can be determined. Given the information that it can and does reveal, an IP address is considered personally identifiable information and, for example, is subject to HIPAA protection. 45 C.F.R. § 164.514(b)(2)(i)(O). Advertisers desire IP addresses because the geographic information allows them to

---

[1] *See* Piwik PRO, Third-Party Tracking, https://piwik.pro/glossary/third-party-tracking/ (last visited Nov. 19, 2025) ("Third-party tracking refers to the practice in which a tracker on a website is set by a different website than the one the visitor is currently on. Third-party trackers are snippets of code that are typically installed on multiple websites. They collect and send information about a user's browsing history to other companies. . . .").

[2] *See* Patti Croft & Catherine McNally, *What Is a Web Beacon and Why Should You Care?*, All About Cookies (Nov. 12, 2025), https://allaboutcookies.org/what-is-a-web-beacon (last visited Nov. 19, 2025).

[3] Per TikTok, the TikTok Pixel gathers information about IP addresses in order to "determine the geographic location of an event" on a website that has the TikTok Pixel installed. *About TikTok Pixel*, Ads.TikTok.com (Mar. 2025), https://ads.tiktok.com/help/article/tiktok-pixel (last visited Nov. 19, 2025).

target specific households, businesses, and even individuals with ads that are relevant to their interests.

38. The Trackers also collect (i) the full destination URL of the page requested on the Lowes Website, including the path and query string; (ii) the referring URL; (iii) precise timestamps for each request; and (iv) header information describing the browser, operating system, and device used (together Device and Browsing Data). In addition, the Trackers place Unique IDs on the visitor's browser or device, such as TikTok's _ttp identifier and Microsoft's MUID, _uetsid, and _uetvid cookies.

39. When Plaintiffs and the other Class members visited the Lowes Website, the Website's code, at Lowes's direction, installed the Trackers onto the users' browsers. It did so seamlessly—and, to users, invisibly—and without notice to the users.

40. By installing the Trackers, Lowes was able to comprehensively monitor users' interactions with the Lowes Website.

41. But the Trackers did far more than record isolated interactions with the Lowes Website. Lowes funneled the information it collected from visitors to TikTok and Microsoft—the key to connecting the Lowes visitors to the vast profiles TikTok and Microsoft maintain. In exchange, TikTok and Microsoft used the data collected from the Lowes Website to match Lowes visitors to their existing, enriched advertising profiles. TikTok and Microsoft then used those matches to make their enriched advertising segments and targeting capabilities available to Lowes for ad delivery, optimization, and measurement. This enabled Lowes to leverage TikTok and Microsoft's extensive demographic, behavioral, location-based, and interest-based data about matched users, data that TikTok and Microsoft had already compiled from their own platforms, partner sites, and third-party sources. Among the many inferences TikTok and Microsoft can make about users are inferences about users' financial and socioeconomic statuses.

42. On information and belief, TikTok and Microsoft either purchase data from third-party data brokers or receive data from their advertisers' data partners—including information those data brokers and data partners have collected from Facebook. As a result, the information that TikTok and Microsoft have for Lowes Website visitors includes data those visitors have shared with Facebook.

43. TikTok and Microsoft also used the Unique IDs their Trackers had installed on Lowes users' web browsers to track those same users as they browsed hundreds of thousands of other websites with the Trackers installed. TikTok and Microsoft made that ongoing cross-site tracking available to Lowes in the form of audience-building, targeting, and aggregated reporting tools.

44. Lowes then used the information it collected through the Trackers to serve hyper-targeted advertisements to users as they traversed the Internet.

45. Both Trackers' collection of information violated CIPA, as set forth below.

**1. The TikTok Pixel**

46. Non-party TikTok is a video-hosting platform owned by Beijing-based company ByteDance Ltd. In addition to allowing users to post videos, TikTok offers several products for businesses, in particular data connections that provide companies data to support their advertising campaigns. One of those products is the TikTok Pixel.

47. The TikTok Pixel is a piece of code implemented by site owners, such as Lowes, onto their websites, which enables website owners to track users' interactions with the website. The website's owner maintains control over the data collected and reported by the TikTok Pixel through the TikTok Events Manager, which website owners can use to specify the events they want to track and report to TikTok. The Pixel also collects and reports supplementary data, including IP addresses (which can be used to determine the geographic location of the user), Unique IDs (which are assigned to a user's device or browser session that distinguish one user from another),

and Device and Browsing Data—(i) the full destination URL of the page requested on the Lowes Website, including the path and query string; (ii) the referring URL; (iii) precise timestamps for each request; and (iv) header information describing the browser, operating system, and device used. A description of the TikTok Pixel from TikTok's website appears below:

Measurement / Web measurement / TikTok Web Measurement Tools

## About TikTok Pixel

Last updated: May 2024

TikTok Pixel is a piece of code that you can place on your website that allows you to share website events with TikTok. The Pixel can be used with any TikTok for Business tools to:

- Measure traffic on your website
- Measure ad campaign performance
- Optimize your campaigns and find new customers

Once you've successfully set up and verified the pixel on your site, it will share information on when an action is taken on your website, based on the events you've set up. We recommend you set up events that reflect a full customer journey on your site, from viewing a product details page to adding an item to a cart and making a purchase. Learn more about the Events Manager.

The pixel collects information available via standard web browsers, like Chrome. This includes:

- **Ad/Event information:** Information about the ad a person on TikTok has clicked on or an event that was initiated.
- **Timestamp:** Used to determine when website actions took place, like when a page was viewed or when a product was purchased.
- **IP Address:** Used to determine the geographic location of an event.
- **User Agent:** Used to determine the device make, model, operating system, and browser information.
- **Cookies:** Used to help with the measurement, optimization, and targeting of your campaigns. First-party cookies are optional, but third-party cookies are on by default with the TikTok Pixel. Performance is boosted when first- and third-party cookies are paired with Advanced matching. Learn more about using cookies with TikTok Pixel to learn more.
- **Metadata & Button Clicks:** Includes descriptive page metadata, structured microdata, page performance data, and button clicks. In the future, this information will enable TikTok to provide recommendations on how to enhance our pixel event setup and offer automated solutions. This information can also be used to personalize ad campaigns for people on TikTok and improve TikTok's ad delivery systems. Learn more about how to enhance data postback with TikTok Pixel.

48. The TikTok Pixel also engages in a process known as "fingerprinting," through which it collects as much information as possible about the Lowes Website user and matches that information to the existing data from TikTok's database that has been gathered from publishers, partners, and other websites with the TikTok Pixel installed, which includes millions of users. *See Moody*, 742 F. Supp. 3d at 1074-75; *see also About Using Cookies with TikTok Pixel*, Ads.TikTok.com (July 2025), https://ads.tiktok.com/help/article/using-cookies-with-tiktok-pixel?redirected=1 (last visited Nov. 19, 2025) (explaining that TikTok uses third-party cookies, which are "enabled by default" with the TikTok Pixel, to "recognize and match events across different websites," and are a tool to better "match events with people on TikTok"). The collected data includes, among other things, browsing activity, app usage, Unique IDs, location data, search history, purchase history, and inferred interests.

Fingerprinting allows TikTok to associate the information it obtained through use of the TikTok Pixel with personally identifying information, and thereby match users to pre-existing profiles.

49. Once installed, the TikTok Pixel creates cookies on visitors' web browsers, which allows TikTok to collect additional data about users visiting the site. One particular cookie, the "_ttp" cookie, is a tracking cookie that identifies a visitor, regardless of whether the visitor has a TikTok account or not. If the user is logged into a TikTok account, the requests sent to TikTok include cookies that can be used to link the data to the user's TikTok profile. That identifier functions across the broader web: whenever a user later visits ***any other website*** that has deployed the TikTok Pixel, TikTok receives new dialing, routing, addressing, and signaling information associated with the same identifier. Accordingly, once Plaintiffs visited the Lowes Website, TikTok was able to continue collecting Device and Browsing Data about their visits to other Pixel-enabled websites and to stitch those data points together into a continuous browsing history tied to Plaintiffs' devices and, when possible, to their TikTok profiles.

50. The below image demonstrates an example of the information collected by the TikTok Pixel, including URL and clicks:



51. Lowes also uses TikTok's "AutoAdvanced Matching" technology, which allows TikTok to scan every website for information. Thus, when a website asks for information, such as name, date of birth, and address, the information is sent simultaneously to TikTok, so that TikTok can isolate with certainty the individual to be targeted. An example of the TikTok Pixel's AutoAdvanced Matching technology is reproduced below:




52. Once the users have been identified, website owners such as Lowes can use the information for analytics as well as for advertising purposes. TikTok's privacy policy (which is not cited or linked on the Lowes Website) specifically mentions several uses of the data:

- "To send promotional materials from us or on behalf of our affiliates and trusted third parties";
- "To measure and understand the effectiveness of the advertisements we serve to you and others and to deliver advertising, including targeted advertising, to you on the Platform";
- "To train and improve our technology, such as our machine learning models and algorithms"; and

- "To combine all the information we collect or receive about you for any of the foregoing purposes."[4]

53. Moreover, TikTok shares the data it collects with third parties, explaining that "[w]e share the categories of personal information listed above with service providers and business partners to help us perform business operations and for business purposes, including . . . advertising and marketing services, analytics, measurement, data storage and hosting. . . ." *Id.*

54. The TikTok Pixel is a process to identify the source of electronic communication by capturing outgoing electronic impulses and identifying dialing, routing, addressing, and signaling information generated by users. The TikTok Pixel is not only "reasonably likely" to identify the source of the outgoing electronic impulses, it is expressly designed for that purpose.

55. The possession of users' private data by TikTok poses particular privacy concerns given TikTok's China-based ownership.[5] As members of Congress from both parties and independent tech watchdogs and human rights groups have acknowledged, the Chinese government exercises tight controls over Chinese companies.

56. China's national security law requires companies to turn over customer data if requested by the government. Even wealthy tech executives who have defied the government mandate have been arrested, jailed, and even "disappeared."

---

[4] *Privacy Policy*, TikTok.com (Aug. 19, 2024), https://www.tiktok.com/legal/page/us/privacy-policy/en?lang%3Den= (last visited Nov. 19, 2025).

[5] While the dangers of China's control over TikTok have led to congressional hearings, calls for divestiture by ByteDance of its interest in TikTok, a law conditioning TikTok's availability in the United States on ByteDance's divestiture, and a recent executive order outlining the details of a potential divestiture, the divestiture has already been delayed multiple times and remains unfinalized. China has yet to accept the proposed deal and continues to exercise control over TikTok.

57. "Our intelligence community has been very clear about China's efforts and intention to mold the use of this technology using data in a worldview that is completely inconsistent with our own," the U.S. Deputy Attorney General Lisa Monaco explained.[6]

58. Moreover, TikTok and its parent company have already abused the data TikTok collected. In 2022, *Forbes* reported that ByteDance's Internal Audit and Risk Control department planned to use location data gathered by TikTok in order to surveil the devices of at least two American citizens.[7]

59. Also in 2022, ByteDance confirmed that several of its employees used TikTok data in an effort to reveal journalist sources. As ByteDance confirmed to CNN, the employees tracked the journalists' IP addresses to determine if they were at the same location as employees suspected of leaking data.[8]

60. TikTok also has a history of flagrant violation of U.S. privacy law. As one example, the federal government is currently suing TikTok for violations of the Children's Online Privacy Protection Act stemming from the company's noncompliance with a related 2019 consent order and its continued unlawful collection of data from millions of children.

---

[6] Billy Perrigo, "What to Know About the TikTok Security Concerns," *Time* (Mar. 23, 2023), https://time.com/6265651/tiktok-security-us/ (last visited Nov. 19, 2025).

[7] Emily Baker-White, "TikTok Parent ByteDance Planned To Use TikTok To Monitor The Physical Location Of Specific American Citizens," *Forbes* (Oct. 20, 2022), https://www.forbes.com/sites/emilybaker-white/2022/10/20/tiktok-bytedance-surveillance-american-user-data/ (last visited Nov. 19, 2025).

[8] Clare Duffy, "TikTok Confirms that Journalists' Data was Accessed by Employees of its Parent Company," *CNN* (Dec. 22, 2022), https://www.cnn.com/2022/12/22/tech/tiktok-bytedance-journalist-data/index.html (last visited Nov. 19, 2025).

**2. Microsoft Bat Bing Tracker**

61. In addition to capturing information using the TikTok Pixel, Lowes also collects the personal information of Lowes Website users through the Microsoft Bat Bing Tracker. The Bat Bing Tracker is a tracker offered by Microsoft, which is also known as "Microsoft Advertising." The Microsoft Bat Bing Tracker places the bat.bing cookie and Microsoft ID ("MUID") on a user's browser, which collect information about the user. By surreptitiously embedding these Trackers, Lowes causes visitors' browsers to transmit this information directly to Microsoft, which Lowes then accesses through Microsoft's advertising and analytics interfaces.

62. Microsoft uses the information transmitted by Lowes to match Lowes Website visitors to existing customer profiles in Microsoft's database. Microsoft has collected massive amounts of data from its advertisers and partners concerning, among other things, browsing activity, app usage, Unique IDs, location data, search history, purchase history, and inferred interests. Microsoft also "purchase[s] demographic data" from "data brokers" and uses "information [it] collect[s] … from the sites and apps of our advertisers and partners" for "personalized advertising."[9]

63. In addition, Microsoft uses the MUID to track users' activity across the Internet. An MUID constitutes personally identifiable information because it is unique to each user and can be used to identify individuals. In fact, Microsoft touts to its business partners (like Lowes) that its ad platform "collect[s] the [users'] IP address and Microsoft cookie," and that the data does not expire for 13 months.

64. Website owners can add the Bat Bing Tracker to the source code of their websites. Doing so allows them to track visitor actions on their websites and measure the effectiveness of advertising. Once Microsoft's trackers are embedded into a website's source code, they send data regarding specific user actions and their unique

---

[9] *Microsoft Privacy Statement*, Microsoft.com (Nov. 2025), https://www.microsoft.com/en-us/privacy/privacystatement (last visited Nov. 19, 2025).

identifiers to Microsoft. Thus, once the MUID was set on Plaintiffs' devices via Lowes Website, Microsoft could recognize the same identifiers when Plaintiffs returned to the Lowes Website ***or when they later visited other websites*** that participate in the Microsoft Advertising ecosystem, allowing Microsoft to continue collecting routing and addressing information linked to Plaintiffs' subsequent web activity.

65. Microsoft utilizes that data collected in several ways, according to its privacy policy, including to: "[a]dvertise and market to [users], which includes sending promotional communications, targeting advertising, and presenting [users] with relevant offers."[10]

66. A screenshot showing the Microsoft Tracker's operation is reproduced below:




67. Microsoft's Tracker is a tool used to identify the source of electronic communication by capturing outgoing electronic impulses and identifying dialing, routing, addressing, and signaling information generated by users. One of the purposes of this tracker is to identify the source of the outgoing electronic impulses.

**3. Lowes Did Not Obtain User Consent To Install A Pen Register**

68. Visitors to the Lowes Website do not receive notice of the Trackers'

---

[10] *Id.*

existence and do not consent to the installation of a pen register on their devices. When a website user accessed and entered the Lowes Website during the applicable limitations period, there was no pop-up window or other notification to inform users that Lowes was using website tracking technology or installing third-party tracker cookies.

69. While Lowes's Terms of Use describe that cookies and other tracking technologies are implemented on the browser in order to collect and store data, including the ability to recognize the users' devices to deliver relevant advertisements, the Terms of Use are not readily visible or highlighted.

70. For visitors to the Lowes Website, the Terms of Use can be accessed only by clicking a hyperlink, which appears in very small font at the bottom of the Lowes Website alongside various other links. A user that does not scroll to the very bottom of the website will not see that link and, even for users that scroll that far, the link is very discrete. A screenshot of the portion of the page containing the link is reproduced below.




71. Given that users do not need to view the Terms of Use to visit the Lowes Website, and that they are not highlighted for visitors to the website, the Terms of Use are not enforceable against website visitors.

72. In addition, minor users of the website are not legally capable of entering into a contract and cannot therefore be bound by the Terms of Use.

**4. The Collected Data Is Valuable**

73. The data that Lowes, TikTok, and Microsoft collect through the Trackers is valuable to both Lowes as well as TikTok and Microsoft.

74. Lowes installed the Bat Bing Tracker to measure and optimize its advertising campaigns on the Microsoft Search Network and Microsoft Audience Network. When users search for home improvement products on Bing, such as "refrigerators near me" or "best riding lawn mowers," Lowes pays Microsoft to display search advertisements directing users to the Lowes Website. The Bat Bing Tracker allows Lowes to determine whether those users who clicked on the search ads subsequently made a purchase, abandoned a shopping cart, or took other valuable actions on the Lowes Website—so-called "conversion tracking." This conversion tracking enables Lowes to calculate which keywords, ad placements, and audience segments generate the most revenue, and to adjust its advertising bids accordingly. That information is made all the more powerful when combined with the financial and socioeconomic inferences Microsoft can make about users.

75. The Bat Bing Tracker also powers Microsoft's retargeting capabilities: once the tracker places an MUID on a user's device via the Lowes Website, Lowes can display targeted advertisements to that user across the Microsoft Audience Network, which spans MSN, Outlook.com, Microsoft Edge, and thousands of partner websites. For instance, a user who viewed blood glucose monitors on the Lowes Website but did not make a purchase can later be shown Lowes advertisements for glucose monitors while reading news on MSN or checking email on Outlook.com. Moreover, the MUID allows Microsoft to track the same user across multiple browsing sessions and devices over time, enabling more sophisticated audience segmentation and cross-device attribution. By providing these measurement, optimization, and retargeting capabilities, the Bat Bing Tracker converts users'

browsing information into actionable intelligence that directly enhances the performance and profitability of Lowes's advertising expenditures.

76. Likewise, Lowes installed the TikTok Pixel on its Website to enable targeted advertising and performance measurement within TikTok's advertising ecosystem. The TikTok Pixel allows Lowes to create "Custom Audiences" on TikTok. In other words, Lowes can identify TikTok users who have visited the Lowes Website and then serve them targeted advertisements while they browse TikTok. For example, if a user viewed a specific product category on the Lowes Website (such as wheelchairs and mobility scooters), Lowes can use the Pixel to retarget the same user later by showing the user TikTok advertisements for those exact products or related items. The Pixel also enables Lowes to track "conversion events," like when a user who clicked a TikTok advertisement later makes a purchase on the Lowes Website. This allows Lowes to measure the return on investment of its TikTok advertising spend and to optimize which advertisements to show to which users.

77. Additionally, the Pixel enables Lowes to create "lookalike audiences" on TikTok: by analyzing the characteristics and behaviors of users who visited the Lowes Website, TikTok can identify other TikTok users with similar profiles and show them Lowes advertisements, even if those users have never visited the Lowes Website. Through these capabilities, the TikTok Pixel directly increases the effectiveness and profitability of Lowes advertising campaigns by enabling precise targeting based on users' browsing behavior, thus converting users' personal information into economic value for Lowes.

78. Meanwhile, TikTok and Microsoft use the data to build even more robust profiles of users, which in turn increases the value of its Trackers to companies like Lowes.

79. The value of the data that Lowes, TikTok, and Microsoft track and collect is quantifiable. Legal scholars observe that "[p]ersonal information is an important

currency in the new millennium."[11] Indeed, "[t]he monetary value of personal data is large and still growing, and corporate America is moving quickly to profit from this trend." *Id.* "Companies view this information as a corporate asset and have invested heavily in software that facilitates the collection of consumer information." *Id.* Indeed, Lowes spends millions of dollars per month on digital advertising. And Microsoft and TikTok earn billions per year in advertising revenue.

80. Empirical studies quantify the appropriate value measure for personal data. Generally, the value of personal data is measured either as the consumer's willingness to accept compensation to sell her data or the consumer's willingness to pay to protect her information.

81. Through its covert collection and transmission of user data, Lowes is unjustly enriching itself at the cost of Plaintiffs' and the Class's privacy and choice, when Plaintiffs and the Class could otherwise choose if and how to monetize their data.

**5. Plaintiffs' Use of the Lowes Website**

82. Plaintiffs, like all Class Members, visited the Lowes Website. Plaintiff Justin Bradshaw did so multiple times, as recently as March 2025. Plaintiff Gustavo Lopez also visited multiple times, as recently as January 2025.

83. When Plaintiffs visited the Lowes Website, the Website, pursuant to Lowes's direction, installed the Trackers on Plaintiffs' browsers. The Trackers collected Plaintiffs' IP addresses, Device and Browsing Data, and placed Unique IDs on their browsers that allowed Lowes to track Plaintiffs' interactions with the Lowes Website, and TikTok and Microsoft to track Plaintiffs' interactions with both the Lowes Website and all other websites that Plaintiffs visited on which the Trackers were installed. TikTok and Microsoft used the collected data to match Plaintiffs to pre-existing profiles by syncing Plaintiffs' data that they received from the Lowes

[11] *See* Paul M. Schwartz, *Property, Privacy and Personal Data*, 117 HARV. L. REV. 2055, 2056-57 (2004).

Website with data they and other third-party tracking companies had already collected from Plaintiffs.

84. Lowes, TikTok, and Microsoft used the data collected from Plaintiffs (i) to identify Plaintiffs and either create new profiles for Plaintiffs in Microsoft and TikTok's databases or match Plaintiffs to pre-existing profiles; (ii) to target Plaintiffs with advertising based in part on their location; and (iii) to increase the effectiveness and profitability of Lowes's advertising campaigns.

85. The Lowes Website did not ask Plaintiffs or the Class whether they consented to having the Trackers installed and their personally identifying and addressing information collected, stored, or disseminated.

86. Additionally, the Trackers were incorporated seamlessly—and, to Plaintiffs, invisibly—in the background on the Lowes Website. That seamless and invisible incorporation gave Plaintiffs and the Class no way of knowing that Lowes was collecting their personally identifying and addressing information, including their IP addresses, Device and Browsing Data, and Unique IDs, secretly sharing that information with undisclosed third parties (including parties subject to the control of the Chinese government), and tracking them as they moved across the Internet.

87. Plaintiffs both had Facebook accounts when they visited the Lowes Website.

### C. PLAINTIFFS HAD A REASONABLE EXPECTATION OF PRIVACY IN CONNECTION WITH THEIR USE OF THE LOWES WEBSITE

88. Plaintiffs had a reasonable expectation of privacy in their ability to browse the Lowes Website without their data being collected; without their data being transmitted to third parties to match them with massive troves of their pre-existing, sensitive personal information that those third parties had collected and purchased; and without being subsequently tracked, both on the Lowes Website and across the Internet.

89. The right to privacy "'encompass[es] the individual's control of information concerning his or her person.'" *In re Facebook, Inc. Internet Tracking Litig.*, 956 F. 3d 589, 598 (9th Cir. 2020).

90. California law defines all of the data that Lowes collected from Plaintiffs—the IP addresses, Device and Browsing Data, and Unique IDs—as "personal information."

91. "Identifiers such as a … unique personal identifier, online identifier, [and] Internet Protocol address" are "personal information" because they "identif[y] … or could reasonably be linked, directly or indirectly, with a particular consumer or household." Cal. Civ. Code § 1798.140(v)(1)(A).

92. For the same reason, California law treats as "personal information" "[i]nternet or other electronic network activity information, including, but not limited to, browsing history, search history, and information regarding a consumer's interaction with an internet website application, or advertisement," "geolocation data," and "[i]nferences drawn from any of the information identified in this subdivision to create a profile about a consumer reflecting the consumer's preferences, characteristics, psychological trends, predispositions, behavior, attitudes, intelligence, abilities, and aptitudes." Cal. Civ. Code § 1798.140(v)(1)(F), (G), (K).

93. Plaintiffs had a reasonable expectation when they visited the Lowes Website that their personal information would not be collected without their consent, would not be transmitted to third parties, and would not be used by third parties to link them to extensive, pre-existing cradle-to-grave consumer datasets, including their prior browsing activity, app usage, location data, and inferred interests, collected from TikTok and Microsoft's vast networks of publishers and third-party data sources.

94. In Lowes's Privacy Statement that was effective at the time of Plaintiffs' visits to the Lowes Website, Lowes itself represented that it would only share personal information with "unaffiliated entities (companies outside the Lowe's family)" like TikTok and Microsoft "**with your consent**." This representation makes a promise

that an objectively reasonable visitor could interpret to mean their data would not be collected and transmitted without explicit consent. Yet Plaintiffs did not provide their consent to have their information collected, shared, and matched to existing profiles, and Lowes did it anyway. After Plaintiffs filed this lawsuit, Lowes conspicuously struck this provision promising consent from its Privacy Statement.

95. Likewise, Plaintiffs had a reasonable expectation that they would not be tracked both on and off the Lowes Website. The mechanism through which Lowes tracked Plaintiffs' web activity was the Unique IDs that Lowes directed TikTok and Microsoft to download onto Plaintiffs' web browsers. Lowes shared those Unique IDs with third parties TikTok and Microsoft, again without Plaintiffs' consent—notwithstanding Lowes's representation that it would only share personal information with third parties "with consent."

### D. DEFENDANT'S USE OF THE TRACKERS TO COMPILE AND EXPLOIT PLAINTIFFS' SENSITIVE PERSONAL INFORMATION WAS HIGHLY OFFENSIVE

96. Lowes's invasion of Plaintiffs' privacy—namely, by collecting Plaintiffs' personal information without consent, enabling third parties to match Plaintiffs to existing consumer profiles, and facilitating the tracking of Plaintiffs across the Internet—was highly offensive.

97. Through the Trackers, Lowes enabled Microsoft and TikTok to match Plaintiffs to profiles containing enormous amounts of sensitive personal information, including IP addresses, demographic data, browsing activity, app usage, Unique IDs, location data, search history, purchase history, and inferred interests. Microsoft and TikTok's systems can make inferences about users' financial and socioeconomic statuses, which Lowes leveraged for targeted advertising. The Trackers Lowes installed enabled these third parties to continue tracking Plaintiffs' actions across the Internet after their encounter with the Lowes Website, allowing Lowes to retarget them with advertisements as they browsed other websites.

98. In its Privacy Statement that was effective at the time of Plaintiffs' visits to the Lowes Website, Lowes admitted that it was collecting personal information, including sensitive personal information, and sharing that information with third parties, but it promised only to do so with explicit user consent.

99. Of course, Plaintiffs never gave their consent for the data to be collected. But Lowes installed the Trackers anyway—which transmitted Plaintiffs' data directly to third parties without Plaintiffs' knowledge. Those third parties included TikTok, whose China-based ownership raises particular privacy hazards as evidenced by previous concerns from Congress, tech watchdogs, and human rights groups. TikTok and Microsoft, in turn, took the data Lowes provided and pervasively tracked Plaintiffs as they moved across the Internet, using Plaintiffs' browsing data to compile their browsing history across numerous websites and build increasingly robust profiles of them. *See supra* ¶¶34-67.

100. After Plaintiffs filed this lawsuit, Lowes amended its Privacy Statement to strike the provision promising to secure consent before sharing user data with third parties, in effect conceding that their prior actions were done in violation of their own policy.

101. Under these circumstances, Lowes's injury to Plaintiffs' privacy right is sufficient for standing under Article III. *See Griffith v. TikTok, Inc.*, 697 F. Supp. 3d 963, 972 (C.D. Cal. 2023) (plaintiffs had Article III standing for injury to their privacy right based on same technology, because TikTok used the Pixel "to assemble extensive profiles containing individuals' browsing histories across numerous websites"); *India Price Carnival Corp.*, 712 F. Supp. 3d 1347, 1363 (S.D. Cal. 2024) ("[C]ourts decline to dismiss invasion of privacy claims where plaintiffs allege that the intercepted information is used to compile a user's browsing history across other websites."); *Gabrielli v. Haleon*, 2025 WL 2494368, at *6 (N.D. Cal. Aug. 29, 2025) (allegations that website "permits … Third Parties to use cookies and other tracking technologies to collect, track, and compile users' … browsing history, visit history,

website interactions, user input data, demographic information, interests and preferences, shopping behaviors, device information, referring URLs, session information, user identifiers, and/or geolocation data" were "enough to show a concrete injury to [plaintiff's] right to privacy and, subsequently, Article III standing"); *Deivaprakash v. Conde Nast Digital*, 2025 WL 2779193, at *2 (N.D. Cal. Sept. 30, 2025) (similar).

### E. LOWES'S USE OF THE TRACKERS CAUSED PLAINTIFFS TO SUFFER A CONCRETE ECONOMIC INJURY

102. In addition, for two independent reasons, Lowes's collection and transmission of Plaintiffs' personal information also caused Plaintiffs an economic injury.

103. Lowes misappropriated Plaintiffs' data without providing compensation, despite there being a market for such data. Plaintiffs' browsing histories carry financial value. *See supra* ¶¶73-81. Lowes's misappropriation of Plaintiffs' data has thus caused them to suffer an economic injury because it frustrated their ability either to sell their data or pay to prevent its disclosure. *See In re Facebook*, 956 F.3d at 600; *Rodriguez v. Google LLC*, 772 F. Supp. 3d 1093, 1110 (N.D. Cal. 2025) (plaintiffs adequately pled economic injury because Google "took something of economic value from them"—their browsing and advertising interaction data—"without their permission"); *Brown v. Google*, 685 F. Supp. 3d 909, 940 (N.D. Cal. 2023) ("[P]laintiffs can state an economic injury for their misappropriated data.").

104. Lowes has also been unjustly enriched at Plaintiffs' expense. By installing the Trackers on Plaintiffs' web browsers, Lowes enabled the collection of Plaintiffs' data without consent. The Trackers, in turn, allowed Lowes, in conjunction with TikTok and Microsoft, to match Plaintiffs to pre-existing profiles and track their activity. Lowes used that information to serve Plaintiffs targeted advertisements, which increased Lowes's revenue. *See supra* ¶¶73-81. Plaintiffs are entitled to the

profits that Lowes has unjustly earned at Plaintiffs' expense. *See Greenley*, 684 F. Supp. 3d at 1038 (Article III standing alleged where "'Plaintiff … conferred a benefit on Defendant through the use and dissemination of Plaintiff's … personal information … which Defendant used and disseminated for its own monetary benefit.'"); *In re Facebook*, 956 F.3d at 600 ("California law requires disgorgement of unjustly earned profits regardless of whether a defendant's actions caused a plaintiff to directly expend his or her own financial resources or whether a defendant's actions directly caused the plaintiff's property to become less valuable. … [T]his stake in unjustly earned profits exists regardless of whether an individual planned to sell his or her data or whether the individual's data is made less valuable."); *Riganian v. LiveRamp Holdings, Inc.*, 791 F. Supp. 3d 1075, 1095 (N.D. Cal. 2025) (sustaining unjust enrichment claim where plaintiffs alleged defendant "'unjustly profited from tracking, disclosing, and profiting from Plaintiffs and U.S. Class members' internet activity and real-world activity to third parties without [their] knowledge or consent'").

### F. PLAINTIFFS' INJURIES ARE TRACEABLE TO LOWES AND REDRESSABLE BY THIS COURT

105. Plaintiffs' injuries are "fairly traceable" to Lowes's challenged conduct, *Spokeo, Inc. v. Robins*, 578 U.S. 330, 338 (2016), because Plaintiffs' private information was captured and transmitted through the use of the Trackers, which Lowes embedded into the Lowes Website. Plaintiffs also meet Article III's redressability requirement. Courts have consistently recognized that violation of privacy rights can be redressed by an award of damages or injunctive relief. *See In re Facebook, Inc., Consumer Priv. User Profile Litig.*, 402 F. Supp. 3d 767, 784 (N.D. Cal. 2019) ("[T]he Ninth Circuit has repeatedly explained that intangible privacy injuries can be redressed in the federal courts."); *Jewel v. Nat'l Sec. Agency*, 673 F.3d 902, 912 (9th Cir. 2011) (similar). Likewise, an award of damages would redress Plaintiffs' economic injuries. Additionally, the injunctive relief Plaintiffs seek

includes terminating all downstream distributions of such personal data illegally collected, which would redress future harms suffered by Plaintiffs and the Class.

### G. PLAINTIFFS HAVE STATUTORY STANDING

106. Plaintiffs adequately allege statutory standing to bring CIPA claims against Lowes arising from the Lowes Website's downloading of the Trackers onto Plaintiffs' web browsers. The Trackers are unauthorized "pen registers" under CIPA because they collected routing, addressing, or signaling information—namely, IP addresses, Device and Browsing Data, and Unique IDs. That routing, addressing, or signaling information allowed Lowes and third parties to obtain personally identifying, potentially de-anonymized information and revealed geographical location and other personal information sufficient for Lowes and third parties to track users as they moved across the Internet and conduct targeted advertising. Plaintiffs were unaware of the tracking and did not consent to it. *Shah v. Fandom, Inc.*, 754 F. Supp. 3d 924, 931-33 (N.D. Cal. 2024).

## V. <u>CLASS ACTION ALLEGATIONS</u>

107. Plaintiffs bring this action individually and on behalf of all others similarly situated in a Class (the "Class") defined as follows:

a. All persons within California who, during the applicable limitations period, visited the Lowes Website, leading to the Trackers being installed on their devices.

108. The following are excluded from the Class: (i) Lowes, Lowes's subsidiaries, parents, successors, predecessors, and any entity in which Lowes or its parents have a controlling interest (including current and former employees, officers, or directors); (ii) persons who properly execute and file a timely request for exclusion from the Class; (iii) the judicial officer(s) and judicial staff overseeing this litigation, as well as any of their spouses or immediate family members; (iv) Plaintiffs' counsel and Lowes's counsel, including attorneys and staff at each of the respective firms; and

(v) the legal representatives, successors, and assigns of any such excluded persons or entities.

109. NUMEROSITY: Plaintiffs do not know the exact number of Class members but believe the number to be well into the hundreds of thousands. Preliminary estimates by Plaintiffs utilizing traffic on the Lowes Website (gathered from third-party marketing tool Semrush), indicate that over one million unique users from California visited the Lowes Website in the past year alone. It is, therefore, impractical to join each member of the Class as a named plaintiff. Further, the size and relatively modest value of the claims of the individual members of the Class renders joinder impractical. Accordingly, utilization of the class action mechanism is the most economically feasible means of determining and adjudicating the merits of this litigation. Moreover, the Class is ascertainable and identifiable from Lowes's records.

110. COMMONALITY AND PREDOMINANCE: Common questions of fact and law exist as to all Class members, and predominate over any questions affecting only individual members of the Class. Such common legal and factual questions, which do not vary between Class members, and which may be determined without reference to the individual circumstances of any Class member, include but are not limited to the following:

a. Whether Lowes installed the Trackers on the Lowes Website;

b. Whether the Trackers are pen registers as defined by law;

c. Whether Plaintiffs and Class members are entitled to statutory damages;

d. Whether Class members are entitled to injunctive relief; and

e. Whether Class members are entitled to disgorgement of data obtained unlawfully.

111. TYPICALITY: The claims of the named Plaintiffs are typical of the claims of the other members of the Class because the named Plaintiffs, like all other

Class members, visited the Lowes Website and had their IP address and other information collected by the Trackers, which were installed and used by Lowes.

112. ADEQUATE REPRESENTATION: Plaintiffs are adequate representatives of the Class because their interests do not conflict with the interests of the Class members they seek to represent, they have retained competent counsel experienced in prosecuting class actions, and they intend to prosecute this action vigorously. The interests of members of the Class will be fairly and adequately protected by Plaintiffs and their counsel.

113. SUPERIORITY: The class action mechanism is superior to other available means for the fair and efficient adjudication of the claims of the Class. Each individual member of the Class may lack the resources to undergo the burden and expense of individual prosecution of the complex and extensive litigation necessary to establish Lowes's liability. Individualized litigation increases the delay and expense to all parties and multiplies the burden on the judicial system presented by the complex legal and factual issues of this case. Individualized litigation also presents a potential for inconsistent or contradictory judgments. In contrast, the class action mechanism presents far fewer case management difficulties and provides the benefits of single adjudication, economy of scale, and comprehensive supervision by a single court on the issue of Lowes's liability. Class treatment of the liability issues will ensure that all claims and claimants are before this Court for consistent adjudication of the liability issues.

## VI. CAUSES OF ACTION

### COUNT I

### Violations of the California Invasion of Privacy Act

### Cal. Penal Code § 638.51

114. Plaintiffs repeat the allegations contained in the foregoing paragraphs as if fully set forth herein.

115. Plaintiffs bring this claim individually and on behalf of the members of the proposed Class against Lowes.

116. CIPA Section 638.51(a) proscribes any "person" from "install[ing] or us[ing] a pen register or a trap and trace device without first obtaining a court order."

117. A "pen register" is "a device or process that records or decodes dialing, routing, addressing, or signaling information transmitted by an instrument or facility from which a wire or electronic communication is transmitted, but not the contents of a communication." Cal. Penal Code § 638.50(b).

118. The Trackers are "pen registers" because they are "device[s] or process[es]" that "capture[d]" the "routing, addressing, or signaling information"—the IP address and Device and Browsing Data—from the electronic communications transmitted by Plaintiffs' and Class members' computers or smartphones. Cal. Penal Code § 638.50(b).

119. Likewise, the Trackers are "pen registers" because they are "device[s] or process[es]" that "capture[d]" the Unique IDs associated with each Tracker from the electronic communications transmitted by Plaintiffs' and Class members' computers or smartphones. Cal. Penal Code § 638.50(b). The Unique IDs are "routing, addressing, or signaling" information because they are used to tie a Website user to TikTok and Microsoft's databases and repositories of information about the user, determine the user's identity, and follow the user as he moves across the Internet.

120. At all relevant times, Lowes installed the Trackers—which are pen registers—on Plaintiffs' and Class members' browsers, and used the Trackers to collect Plaintiffs' and Class members' routing, addressing, or signaling information—IP addresses, Device and Browsing Data, and Unique IDs.

121. Plaintiffs and Class members did not provide their prior consent to Lowes's installation or use of the Trackers.

122. Lowes did not obtain a court order to install or use the Trackers.

123. Pursuant to Cal. Penal Code Section 637.2, Plaintiffs and Class members have been injured by Lowes's violations of CIPA Section 638.51(a), and each seeks statutory damages of $5,000 for each of Lowes's violations of CIPA Section 638.51(a).

## VII. PRAYER FOR RELIEF

WHEREFORE, Plaintiffs, individually and on behalf of all others similarly situated, seek judgment against Lowes, as follows:

a. For an order certifying the Class, naming Plaintiffs as the representatives of the Class, and naming Plaintiffs' attorneys as Class Counsel to represent the Class;

b. For an order declaring that Lowes's conduct violates the statutes referenced herein;

c. For an order finding in favor of Plaintiffs and the Class on all counts asserted herein;

d. For statutory damages of $5,000 for each violation of CIPA Section 638.51(a);

e. For pre- and post-judgment interest on all amounts awarded;

f. For an order of restitution and all other forms of equitable monetary relief; and

g. For an order awarding Plaintiffs and the Class their reasonable attorneys' fees and expenses and costs of suit.

## VIII. JURY DEMAND

Plaintiffs hereby demand a trial by jury of any and all issues in this action so triable of right.

DATED: November 19, 2025

**BERNSTEIN LITOWITZ BERGER & GROSSMANN LLP**

*/s/ Avi Josefson*
Avi Josefson (admitted *pro hac vice*)
NYS Bar No. 4149407
(avi@blbglaw.com)
Michael Blatchley (admitted *pro hac vice*)
NYS Bar No. 4747424
(michaelb@blbglaw.com)
Todd Clayton (*pro hac vice* forthcoming)
(todd.clayton@blbglaw.com)
1251 Avenue of the Americas
New York, NY 10020
Tel: (212) 554-1400

-and-

Jonathan D. Uslaner
Bar No. 256898
(jonathanu@blbglaw.com)
2121 Avenue of the Stars, Suite 2575
Los Angeles, CA 90067
Tel: (310) 819-3481

**DON BIVENS PLLC**
Don Bivens (*pro hac vice* forthcoming)
(don@donbivens.com)
Teresita T. Mercado (*pro hac vice* forthcoming)
(teresita@donbivens.com)
15169 N. Scottsdale Road, Suite 205
Scottsdale, AZ 85254
Tel: (602) 762-2661

*Counsel for Plaintiffs*